IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

> Plaintiff,

vs.                                                            No. CR-07-2437 MV

JOSHUA HERNANDEZ-CHAPARRO,

> Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Joshua Hernandez-Chaparro's Motion to Suppress [Doc. No. 18], filed January 22, 2008.  On April 15, 2008, the Court heard evidence concerning the motion and took the matter under advisement.  On May 20, 2008, the Court *sua sponte* ordered the parties to submit briefs regarding the impact of *United States v. Reeves*, 524 F.3d 1161 (10th Cir. 2008), on the matter before the Court, and the parties responded accordingly.  The Court, having considered the evidence presented at the hearing, the briefs submitted by the parties, and the relevant law, finds that Defendant's motion is not well taken and will be **DENIED.**

## BACKGROUND

At 4:57 a.m. on October 15, 2007, Otero County Sheriff Deputy Kenneth Figueroa, who was serving as on-call deputy, was at home asleep when he received a phone call from dispatch advising him that a victim of possible child abuse had been taken to Memorial Medical Center in Las Cruces, New Mexico.  Dispatch informed Deputy Figueroa that Captain Eduardo Medrano of the Otero County Sheriff's Department ("Sheriff's Department")  would be responding to the residence at 249 Divine Way in Chaparral where the possible child abuse may have occurred.

1

After Deputy Figueroa received the phone call from dispatch, he gathered as much information as possible and learned that there "may be a situation" regarding the other children at the home where the possible child abuse took place.  He was also told that he would need to travel quickly to the hospital in Las Cruces because the child who had been injured was suffering from a head injury that was considered serious enough to require him to be taken to a level one trauma center.

Deputy Figueroa then left for the hospital in Las Cruces, which is about 25-30 miles from his home.  On his way to the hospital, he spoke with a registered nurse and gathered more information.  He arrived at the hospital at 6:00 a.m. and shortly thereafter learned from the attending doctor that the child, who was about 2 years old, had suffered a broken lower leg, known as a "spiral fracture," and that there was fluid in the right side of his brain.  During his conversation with the doctor, which lasted about five minutes, Deputy Figueroa was also able to view x-rays of these injuries.  After speaking with the doctor, Deputy Figueroa went to see the child and his mother, Ms. Guadalupe Estrada, who were together.  When he saw Ms. Estrada, he noticed that she seemed worried and was trying to comfort her child.

In an effort to determine whether anything negligent or criminal had occurred, Deputy Figueroa began to ask Ms. Estrada about what had happened.  She told Deputy Figueroa that after coming out of the shower she noticed that her child had fallen down the stairs and had a scratch above his eye.  She stated that at that time, the child was fine. She then dropped off the child at her sister's house next door, before going to work.  Later in the day, her boyfriend, Defendant Joshua Hernandez, picked up the child and took him home.  When Ms. Estrada returned home from work, she noticed Defendant was outside with his boss.  Defendant told her the child was throwing up "like the exorcist."  He also told her that the child had walked into a

2

heating vent in the floor.  As Ms. Estrada entered the home, she could smell the odor of vomit. She found her child sitting in a pool of vomit, with vomit on his clothes and on the floor. According to Ms. Estrada, Defendant told her that he did not clean up the vomit because he wanted to be sure that she would believe him.

Later in the conversation, she told Deputy Figueroa that after observing her son for a day, she took him to a doctor in Juarez, Mexico, because she could not afford medical care in the United States.  According to Ms. Estrada, the doctor in Mexico told her that nothing was wrong with the child and gave her medicine for his stomach.  Later, Deputy Figueroa learned from the medical staff at Memorial Medical Center that this medicine was actually for animals, and not for human consumption. After Ms. Estrada returned from Mexico, she left her son with her grandmother because she felt that Defendant "couldn't take care of him" and also because she was planning on breaking up with Defendant.

During the course of the conversation, Deputy Figueroa, questioned Ms. Estrada about whether she trusted Defendant as a caretaker of her children and according to Deputy Figueroa, Ms. Estrada "didn't express too much concern."  However, she did tell Deputy Figueroa that her boyfriend's name was Joshua Hernandez and that he was a deported felon.  She also told Deputy Figueroa that her other two children were with her boyfriend at her home and she expressed some concern about this because "if something had occurred between the boy and Defendant, she didn't want them to be together."

At some point during his conversation with Ms. Estrada, at approximately 6:20 a.m., the conversation was interrupted by a phone call from Captain Medrano who had gone to Ms. Estrada's home in Chaparral to talk with Defendant and check on the welfare of Ms. Estrada's two other children.  Captain Medrano told Deputy Figueroa that Defendant had identified

3

himself as "Josh Lopez," and in response, Deputy Figueroa stated that this was not the name that Ms. Estrada gave him; and that she had said his name was "Josh Hernandez." Deputy Figueroa then told Captain Medrano that according to Ms. Estrada, Defendant was a deported felon. Although Deputy Figueroa did not know what felony Defendant had committed, he knew that Captain Medrano had gone "by himself" to Defendant's home and he thought it was important for Captain Medrano to be aware of this so that he could take appropriate safety precautions.

Deputy Figueroa then went back to the room where he had spoken earlier with Ms. Estrada and advised her of her Miranda rights.  At that time, he also took a recorded statement and Ms. Estrada gave Deputy Figueroa consent to search her residence.  During this interview, Deputy Figueroa noticed that her story started to change.  She stated that although she was not concerned about her child's fall from the stairs and didn't see anything abnormal besides the scratch, she did notice that he was ill.  She also stated that she waited a certain number of days or an extended period of time before taking him to the doctor in Mexico.  In response to Deputy Figueroa's questions, Ms. Estrada admitted that she would hit her children to discipline them.

At 5:15 -5:30 a.m., approximately one half hour after Deputy Figueroa was dispatched to the Medical Memorial Center in Las Cruces to investigate allegations of possible child abuse, Lieutenant Ledbetter contacted Captain Medrano of the Sheriff's Department and directed him to go to the residence in Chaparral where the possible child abuse may have occurred, at 249 Divine Way.[1]  During this phone call, Captain Medrano learned that a small child had been seriously hurt at the Chaparral residence and that somebody needed to respond to the residence to check on a couple of children who were there.

---

[1]Captain Medrano has been employed with the Sheriff's Department 13 years, has a total of 19 ½ years experience in law enforcement, and has lived in Chaparral since 1992.

Captain Medrano arrived at the residence on Divine Way which was located about a mile from his home, between approximately 5:45 a.m. and 6:00 a.m.  He knocked on the door and Defendant came to the door and identified himself as Josh Lopez.  Captain Medrano told Defendant that the Sheriff's Department was investigating possible child abuse that may have occurred at his residence and that there was a concern for two other children at the residence.  He then stated that he had been asked to check on the welfare of the children.   Defendant replied to the effect that if Captain Medrano needed to see the children, he could.   Defendant let Captain Medrano into his home and Captain Medrano was able to see both children, speak with them and verify that they were alright.  Captain Medrano then asked Defendant if he had some form of identification.  Again, Defendant told him that his name was Josh Lopez and gave Captain Medrano his date of birth and his social security number but he could not provide an identification card.  At this point, approximately 15-20 minutes after Captain Medrano had arrived at Defendant's home, he contacted Deputy Figueroa to let him know what he had found out and to see what else needed to be done.  During the course of the conversation, Captain Medrano informed Deputy Figueroa that Defendant had identified himself as Josh Lopez, to which Deputy Figueroa responded "something's not right."  Captain Medrano asked him, "why?" and Deputy Figueroa replied that the mother of the child had told him that her boyfriend's name was Josh *Hernandez*.

After the phone call, Captain Medrano asked Defendant again what his name was and again Defendant told him his name was Josh Lopez.  Captain Medrano told Defendant that he had "conflicting information" and that he had been told his name was Josh Hernandez.  At that point, Defendant put his head down and acknowledged that his name was Hernandez.  Captain Medrano then asked Defendant why he had given him a false name and Defendant stated that he

5

had recently got out of prison and that he was a deported felon. Captain Medrano also

discovered that the social security number that Defendant had first provided to him was

different, by one digit, from Defendant's actual social security number. Captain Medrano then

issued a citation to Defendant for concealing his identity in violation of N.M.S.A. § 30-22-3, a

petty misdemeanor. Although he had discretion to have Defendant sign the citation and agree to

appear in court, or to arrest Defendant and take him into custody at that time, Captain Medrano

decided to arrest him. Captain Medrano explained that he decided to arrest him rather than

simply issue a citation and have him appear in court, because of the fact that there was a child-

abuse investigation in process and it was unknown whether the person responsible for the alleged

abuse was Defendant or the mother of the victim. He wanted to be sure that he would have

"access" to Defendant. He testified that his decision to arrest was not based on the fact that

Defendant was a deported felon. He did not transport Defendant into custody, nor did he at any

time contact any immigration officials regarding Defendant's status as a deported felon.

Although he wrote on the citation that Defendant was a deported felon, Captain Medrano stated

that he did so, because it was an important factor in establishing probable cause: it explained

why Defendant was concealing his identity.

Operation Stonegarden

 Operation Stonegarden is a grant of money provided by the federal government to the

Sheriff's Department to enforce border safety and security. These federal funds are used in part

to pay Otero County Sheriff's deputies for overtime work involving certain operations, such as

roadblocks or warrant roundups in areas of the county that are close to the border and also to

conduct "normal patrol duties" in border areas that need attention because of a lack of

manpower. The overtime funded by the federal government is available to every deputy within

the Department.  For example, in Chaparral which is located in an outlying area of Otero County and close to the border (approximately 20 miles and a 15-10 minute drive from the border), there are few deputies who work there and the Stonegarden funds are used to pay deputies for overtime so that law enforcement can have a greater presence in the area.

Lieutenant Leon Ledbetter is responsible for overseeing Stonegarden operations.  Captain Medrano, although of a higher rank, does not supervise or have anything to do with them.  The process is as follows:  a deputy will inform Lieutenant Ledbetter that he is available to work for Stonegarden on his days off and will tell him what days he wants to work.  Then the deputy will be assigned an area in which to work and if, for example, the deputy is assigned to Chaparral, he will respond to calls within the community or will enforce the laws, such as traffic laws.

Although Deputy Figueroa works 20 hours Stonegarden overtime per pay period, and he was specifically involved in this operation on September 10, 2007, including a residence at 233 Divine Street in Chaparral, there was no evidence presented to suggest that the police investigation in *this* case was in any way related to Operation Stonegarden.

Defendant introduced into evidence a "contact sheet" that can be used by Otero County Sheriff's deputies when they are working Stonegarden operations and one of the questions included on the sheet is whether Border Patrol has been contacted.  However, no such "contact sheet" was presented to the Court documenting the investigation of child abuse or arrest of Defendant in *this* case.

According to Deputy Figueroa, Stonegarden operations are planned ahead of time and the child abuse investigation, unlike Stonegarden operations, was not.  Deputy Figueroa and Captain Medrano were called out of their houses to perform their "regular duties" and Captain Medrano testified that his time in the instant case was not attributed to Stonegarden.  Deputy Figueroa

7

testified that he did not intend to use this investigation as a statistic for purposes of Stonegarden, nor did the fact that this was overtime work mean that he was obligated to incorporate the practices consistent with Stonegarden, namely border security practices.  When he submitted his pay sheet covering the investigation on October 15, 2007, he did not specifically request Stonegarden time.  He stated that the child abuse investigation and the fact that one officer was dispatched to the hospital while another officer was dispatched to the home on Divine Way, had "nothing at all" to do with Stonegarden.  He stated that child abuse is something that the Sheriff's department would investigate 100% no matter what the race of the victim or the perpetrator and that if an allegation of child abuse involved an address somewhere in Otero County other than Divine Way, he would have investigated it.

The Court found the testimonies of Captain Medrano and Deputy Figueroa to be credible.

## PROCEDURAL HISTORY

On October 15, 2007, Captain Medrano of the Sheriff's Department arrested Defendant for concealing his identity in violation of N.M.S.A. § 30-22-3.  A deputy with the Sheriff's Department subsequently transported and took Defendant into custody.  While in custody, during an interview with Border Patrol, it was learned that Defendant did not have any immigration documents allowing him to enter or remain in the United States legally and a detainer was placed on him.  After Defendant pleaded guilty to concealing his identity on October 17, 2007, Defendant was transferred to the custody of ICE (Immigration and Customs Enforcement).  While in ICE custody, record checks indicated that Defendant had been deported from the United States subsequent to an aggravated felony conviction.  On December 5, 2007, a one-count indictment was filed charging Defendant with a violation of 8 U.S.C. § 1326 (a) & (b), illegal reentry of a removed alien.  On January 22, 2008, Defendant filed a motion to suppress

evidence arguing that all evidence of his identity should be suppressed because it was obtained in violation of his Fourteenth Amendment right to Equal Protection of the law and Fourth Amendment right to be free from unreasonable searches and seizures.  This Court held a hearing on Defendant's motion to suppress on April 15, 2008.

### DISCUSSION

1.   <u>Equal Protection and Selective Enforcement of the Law</u>

Defendant contends that his Fourteenth Amendment right to Equal Protection of the law was violated by Captain Medrano of the Sheriff's Department when he "impermissibly targeted [him] for enforcement of the criminal laws solely on the basis of his ethnicity and national origin" by detaining the Defendant in his home and subsequently arresting him for concealing his identity, a petty misdemeanor.  Defendant asserts that Captain Medrano undertook these actions against him to further a policy and program or custom maintained by the Department, through which the Department repeatedly engaged in a number of law enforcement operations meant to identify, detain and/or arrest Hispanics solely in an effort to determine their immigration status.  According to Defendant, these operations have included warrantless raids of the homes of Hispanics without reasonable suspicion (to the exclusion of non-Hispanics) in order to interrogate these Hispanic individuals to determine whether they were United States citizens or legal residents.  Defendant claims that Sheriff's deputies have not detained or questioned non-Hispanic individuals and non-Hispanics have not been targeted in any way for the selective enforcement of the immigration laws.  Defendant contends that as a result, although similarly-situated individuals could have been stopped or questioned for offenses such as having a dangerous refrigerator, there is no evidence that such non-Hispanics were actually targeted by deputies of the Sheriff's Department as part of its "immigration sweep."  Defendant alleges that

he was only identified for enforcement of the criminal law because of his ethnicity and national origin and that the Otero County Sheriff's Deputies acted with racially discriminatory intent and effect in pursuing a policy which targeted only Hispanics.

If accepted as true, the allegations regarding the discriminatory policy and program known as Stonegarden that is maintained by the Sheriff's Department to target Hispanics, are deeply troubling to the Court. However, these allegations have not been substantiated and Defendant did not present any testimony regarding the allegations from which the Court could judge their veracity. Furthermore, even if accepted as true, Defendant failed to establish any nexus between the Stonegarden policy and the law enforcement actions taken against Defendant in this case. For these reasons, Defendant fell short of sustaining his burden of demonstrating selective enforcement of the laws, in violation of Equal Protection.

The Equal Protection Clause prohibits selective enforcement of the law based on considerations such as race [or ethnicity]. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed. 2d 89 (1996). "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003).

The standard for proving a violation of Equal Protection in the context of a selective enforcement claim is a "demanding" one. *United States v. Armstrong*, 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996). This is so because courts have adopted a presumption that prosecutors, and by analogy, law enforcement officers, have "properly discharged their official duties" and have, therefore, *not* violated equal protection (emphasis

10

added).  *Id.* at 464 (citing *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)).  In order to dispel the presumption that a prosecutor [or law enforcement officer] has not violated equal protection, a criminal defendant must present "clear evidence to the contrary."  *Id.* at 465 (quoting *Chemical Foundation, Inc.* 272 U.S. at 14-15); *see also Marshall,* 345 F.3d at 1167 (holding that claims of selective enforcement of the laws "should be held to a similarly high standard" as that applied to selective prosecution claims); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, 'a demanding one.'").

A defendant claiming selective-enforcement of the criminal laws must establish that the enforcement of the laws had a "discriminatory effect *and* that it was motivated by a discriminatory purpose" *Armstrong,* 517 U.S. at 465 (emphasis added); *accord*, *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).  The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision.  *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) (quoting *Vil.of Arlington Hts. v. Metro. Housing Dev.*, 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).  The decision-maker must have selected a particular course of action, at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.  *McCleskey v. Kemp*, 481 U.S. 279, 298, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (citation omitted).

<u>Discriminatory Effect</u>

To establish that enforcement of the criminal law had a discriminatory effect, a defendant must make a credible showing that a similarly situated individual of another race or ethnicity could have been subjected to the same law enforcement action as the defendant, but was not.

*See James v. United States*, 257 F.3d 1173, 1179 (10th Cir. 2001).  The defendant may satisfy

this requirement by identifying a similarly situated individual or through the use of statistical

evidence.  *Id.* at *1179* (citing *Chavez v. Illinois State Police*, 251 F.3d 612, 636 (7th Cir. 2001)).

*See, e.g., Armstrong*, 517 U.S. at 467 (noting the similarly situated requirement was met by

"indisputable evidence" in *Hunter v. Underwood*, 471 U.S. 222 (1985), that blacks were 1.7

times as likely as whites to suffer disenfranchisement under the law in question).

Here, Defendant failed to present evidence of either.  In the context of his arrest for

concealing his identity, he was unable to identify a non-Hispanic white individual who had been

issued a citation but *not* arrested for concealing identity, nor did he provide any statistics

demonstrating differential treatment.  If Defendant had presented reliable and relevant statistics

demonstrating, for example, that Hispanics in Otero County are arrested and taken into custody

for the offense of concealing identity, rather than merely issued citations, at a *disproportionately*

higher rate than non-Hispanic whites, he may have come closer to establishing the element of

discriminatory effect.[2]  Likewise, in the context of the law enforcement decision to dispatch

Captain Medrano to Defendant's home for the purpose of investigating allegations of child abuse

and to check on the welfare of the children, Defendant failed to identify a similarly situated

individual and provided no statistics supporting an inference of any disparate treatment in this

regard.

Instead, Defendant attempted to prove discriminatory effect by asserting that the

---

[2]The Court notes the difficulty in identifying an individual who is "similarly situated" to Defendant.  This is so because the offense of concealing identity by its very nature arises under a myriad of different circumstances and therefore, it may be difficult to identify an individual who is *sufficiently* similarly situated to effectuate a meaningful comparison.  *See Radue v. Kimberly-Clark, Corp.*, 219 F.3d 612, 619 (7th Cir. 2000) (noting that the similarly situated requirement requires a showing of "common features essential to a meaningful comparison"); *see Chavez*, 251 F.3d at 636 ("determining whether someone is similarly situated [is an] essentially factual . . . inquiry--different factors will be relevant for different types of inquiries").

investigation in this case was undertaken pursuant to an allegedly discriminatory and unconstitutional policy operated by Sheriff's Department using federal government funding that intentionally discriminated against Hispanics for the purpose of identifying and prosecuting illegal aliens in Chaparral, a small community in Southern New Mexico close to the Mexican/U.S. border.

Defendant failed to present any evidence to substantiate these allegations and the Court is therefore unable to determine the veracity of these claims.  However, even if the allegations are accepted as true, they are not sufficient standing alone to support an inference of discriminatory effect.  Defendant would also need to establish a nexus between the discriminatory policy and the law enforcement actions undertaken in *this* case.

The circumstances in this case are entirely different from those of the allegedly "illegal raids" against Hispanics.  Defendant was not pretextually approached at his home regarding an alleged violation of an innocuous criminal law or civil ordinance, such as having a dangerous refrigerator in his yard, or a barking or loose dog.  In sharp contrast, he was approached at his home so that Captain Medrano could check on the welfare of the two children who were in his care and so that Captain Medrano could gather more information regarding the allegations of serious child abuse that may have occurred at Defendant's home. Unlike Stonegarden operations, the police encounter with Defendant was not planned or scheduled.  The child abuse allegations arose abruptly in the early morning hours of October 15, 2007 after hospital personnel at Memorial Medical Center in Las Cruces reported that a young child had been brought to the hospital with serious injuries, indicating that he may be the victim of child abuse.  Unlike Stonegarden operations, only *one* law enforcement officer was dispatched to Defendant's home.

Deputy Figueroa testified that he had no intention of using this case as a statistic for

purposes of qualifying for Stonegarden compensation and that the investigation of child abuse had "nothing at all" to do with Operation Stonegarden. Captain Medrano testified that their duties with regard to the child abuse investigation were "regular duties" and that they were not part of Operation Stonegarden. Indeed, Captain Medrano does not participate in any way with Stonegarden operations. According to Captain Medrano, although Lieutenant Ledbetter is the supervisor of Operation Stonegarden, the only reason he was involved in this case was because he was the on-call detective at the time.

Deputy Figueroa testified that he would investigate child abuse no matter what the race of the victim or perpetrator and that if an allegation of child abuse involved an address somewhere in Otero County other than Divine Way, he would have investigated it. It is abundantly clear that this investigation was not related in any way to Operation Stonegarden. In failing to establish any nexus between the alleged illegal raids and the law enforcement actions in this case, Defendant fell far short of sustaining his burden of making a credible showing of discriminatory effect.

At this juncture, Defendant's selective enforcement claim must fail because in order to succeed, he must establish both discriminatory effect *and* discriminatory intent. However, assuming *arguendo* that Defendant were to have established discriminatory effect, his Equal Protection claim fails because he cannot make "a credible showing" of discriminatory *intent*.

Discriminatory Intent

Some of the facts relevant to establish discriminatory effect may also be relevant to establish discriminatory intent, and in this regard, the two elements are somewhat interrelated. As with discriminatory effect, statistics can also be used to prove discriminatory intent. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20, 97 S.Ct. 1843, 52 L.Ed. 2d 396

(1977) ("statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination").  However, statistics will rarely be enough, standing alone to establish discriminatory intent.  *See, e.g., Chavez,* 251 F.3d at 640 (while helpful, purely statistical evidence is rarely sufficient to support an equal protection claim, but can be sufficient to establish discriminatory effect); *see also United States v. Mesa Roche,* 288 F. Supp. 2d 1172, 1192-93 (D. Kan. 2003) (statistical evidence, while sufficient to establish discriminatory effect, did *not* establish discriminatory intent absent evidence that officer intentionally discriminated against the defendant).[3]

As noted earlier, Defendant did not introduce *any* statistics into evidence, nor was he able to meaningfully connect the alleged "illegal raids" with the law enforcement actions undertaken in *this* case.  Furthermore, he presented no evidence that raised an inference of intentional discrimination on the part of Captain Medrano.

Before Captain Medrano left his home in the early morning hours of October 15, 2007, he had been informed by Lieutenant Ledbetter about the allegations of serious abuse of a very young child that had taken place at Defendant's home and he had also been informed that the mother of the injured child had expressed concern for the welfare of her two children who were in the care of her boyfriend (Defendant) at that time.  In this regard, the Court is satisfied that the reason Captain Medrano went to Defendant's home was *not* under any pretext so that he could verify his status as an illegal alien and then transfer him to the custody of immigration authorities.  Rather, the purpose was to check on the welfare of two children at the Defendant's

---

[3]In *Mesa-Roche*, the defendant failed to present any direct or circumstantial evidence, such as the use of discriminatory language, treatment or behavior towards the defendant and the officer testified that he had "no idea" of the defendant's race or ethnicity before deciding to stop motorist after the defendant had nearly struck a highway worker.

home and to investigate allegations of very serious child abuse.  Indeed, at the time he went to Defendant's home, Captain Medrano did not know that Defendant was Hispanic, let alone a deported felon.  He did not find out that Defendant was a deported felon until after he spoke with Deputy Figueroa, in the course of his encounter with Defendant.

Captain Medrano's decision to arrest Defendant for concealing his identity, likewise, was not motivated by any intent to bring Defendant into custody so that he could be transferred to the custody of immigration authorities.  Neither Defendant's ethnicity, national origin, nor his status as an illegal alien, were "motivating factor[s]" in Captain Medrano's enforcement of the laws. *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). Although it is true that Captain Medrano wrote on the citation that Defendant was a "deported felon," he explained that he included this information because it established probable cause for the arrest.  Moreover, Captain Medrano testified that he decided to arrest Defendant, rather than merely issue a citation to him, because he wanted to be sure that Defendant would remain accessible for questioning, given that he was in the process of investigating an allegation of serious child abuse and it was not clear whether Defendant or his girlfriend might have been responsible for the child's injuries.  Indeed, on the very same day, after Deputy Figueroa returned from the hospital in Las Cruces, he interviewed Defendant regarding the child abuse allegations while Defendant was in custody.

Particularly detrimental to Defendant's claim of selective enforcement of the law, was his failure to present evidence that Captain Medrano had *any* history of discriminatory law enforcement practices either in Chaparral or elsewhere in Otero County or New Mexico.

The case at hand is meaningfully distinguishable from *Marshall*.  In *Marshall*, the Tenth

Circuit reversed a district court's grant of summary judgment for the defendants in a § 1983

action.  345 F.3d at 1157.  The case involved an African-American motorist who was stopped by

a police officer for various alleged traffic violations, including failing to stop his vehicle after the

officer had engaged his emergency lights.  The plaintiff alleged that he did not commit the traffic

violation for which he was initially stopped and that prior to the stop, the police officer made eye

contact with him while he was waiting at an intersection.  He also alleged that the first thing the

officer did when he approached him was to accuse him of being on crack, after which the

plaintiff was arrested on several charges, including the traffic violation, driving under the

influence and resisting arrest.  On his citation form, the officer wrote "B/M" which the Tenth

Circuit presumed to mean black male.  The officer's written report of the incident changed

dramatically between the date of the incident and the date of his subsequent affidavit.  In

addition, the plaintiff presented evidence regarding extensive alleged misconduct by the officer

during his previous employment in Midland, Texas, including a report by a supervisor which

stated that the officer had failed "to treat people fairly and equally under the law." *Id.* at 1170.

The plaintiff alleged that an analysis of the officer's arrest records obtained from the Midland

investigation would establish a pattern of discrimination against blacks and Hispanics and a

modus operandi similar to that in his case.

The Tenth Circuit disagreed with the district court's conclusion that there was nothing in

the record to indicate differential treatment of the plaintiff or a discriminatory purpose.  It found

that *without* the evidence of the alleged misconduct and arrest reports, "it [was] a close question

whether the evidence was sufficient to go to trial on the allegations of racial discrimination." *Id.*

However, it found that the evidence of officer misconduct and arrest records, together with other

facts on the record regarding the plaintiff's traffic stop, were "sufficient to create a triable issue

17

on plaintiff's claim of racially selective law enforcement." *Id.* at 1171.  It stated that the documents regarding alleged misconduct of the arresting officer might "establish a pattern of traffic stops and arrests that raises an inference of racial discrimination or provide evidence that similarly situated individuals of a different race received differential treatment."  *Id.*

In this case, Defendant did not establish any nexus between the actions of Captain Medrano and the alleged discriminatory practices of the Sheriff's Department in conducting certain Stonegarden operations.  The conduct of Captain Medrano was *not* consistent with the "modus operandi" of the Sheriff's Department in conducting alleged illegal raids in the Chaparral area.  Unlike the law enforcement officer in *Marshall*, prior to his decision to approach Defendant at his home, Captain Medrano was *not* aware of Defendant's race, ethnicity or status as an illegal alien, indicating that this decision was not made because of Defendant's race, ethnicity or status as an illegal alien.  Moreover, there is no indication that Captain Medrano employed any racial or otherwise derogatory language that might reflect a discriminatory intent on the part of Captain Medrano.  Significantly, there was no evidence presented suggesting or documenting any prior unequal or unfair treatment against Hispanics by Captain Medrano in Chaparral, or elsewhere in Otero County or New Mexico.  This is so, even though Captain Medrano has lived in Chaparral, New Mexico, for approximately sixteen years and has been in law enforcement for 19 ½ years.  Presumably if Captain Medrano had any history of discriminating against Hispanics during his lengthy law enforcement career, such information would have been brought to the attention of the Court.

The government highlighted the fact that Captain Medrano and Captain Figueroa are Hispanic and argued in essence that because they are Hispanic, they would not discriminate against other Hispanics.  The Court will not indulge any presumption that because the officers

were of the same ethnicity as Defendant, that they would not, or would be any less likely to discriminate against him on the basis of his ethnicity. *See Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (after establishing a prima facie case of discrimination against Mexican-Americans in county grand jury selection, the fact that Mexican-Americans held a 'governing majority' in county elective offices did not dispel presumption of intentional discrimination, in that it could not be presumed as a matter of law that human beings of one definable group [Mexican-Americans] will not discriminate against other members of their group).

2.      Fourth Amendment

        Defendant argued in his motion to suppress that he was confronted by deputies of the Sheriff's Department in the early morning hours of October 15, 2007 "based on nothing more" than his ethnic status as "Hispanic."  He maintains that "by detaining, interrogating and seizing [him] without reasonable suspicion or probable cause to believe that he was engaged in criminal activity-the deputies violated his Fourth Amendment rights."

        The Court notes at the outset that for purposes of its Fourth Amendment analysis, the officer's subjective intent is irrelevant.  *See Whren,* 517 U.S. at 813.  The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *See Payton v. New York*, 445 U.S. 573, 589-90 (1980).  In *Payton*, the Supreme Court, recognizing that the Fourth Amendment has drawn a firm line at the entrance to the home, held that "seizures inside a home without a warrant [for the purpose of making a felony arrest] are presumptively unreasonable." *Id.* at 586.

The Court left open two ways in which the government can overcome this presumption:  first, by showing probable cause *and* exigent circumstances; or (2) by showing consent to the entry. *See id.* at 583, 590.  The rule enunciated in *Payton* is clear.  In order to make a lawful entry for the purpose of effectuating a felony arrest, police officers, *absent* consent, must either obtain a warrant or have probable cause *and* exigent circumstances."  *Id.* at 586; *see Kirk v. Louisiana*, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed 599 (2002).  *Payton*'s requirements have also been applied to the nonconsensual entry of law enforcement into the home to make warrantless arrests for *nonfelonious* offenses.  *See Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).  This Court, cognizant of the special protection that the Fourth Amendment affords to individuals within the privacy of their homes, has been particularly vigilant in assessing the conduct of Captain Medrano in the case at hand.

     A.    <u>Police-Citizen Encounter at Defendant's Home</u>

The government contends that the entire pre-arrest encounter between Captain Medrano and Defendant at his home was consensual.  The Court agrees.

Encounters between police officers and citizens generally can be categorized as arrests, investigatory stops, or consensual encounters. *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).  Consensual encounters do not implicate the Fourth Amendment.  Furthermore, a consensual encounter is not a seizure for purposes of the Fourth Amendment.  *United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000).  A seizure occurs only when an officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen. *United States v. Zapata*, 997 F.2d 751, 756 (10th Cir. 1993).  In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable

person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

In *United States v. Zapata*, 997 F.2d 751, 756-57 (10th Cir. 1993), the Tenth Circuit set forth several non-exclusive factors relevant to a determination of whether a seizure has occurred, including: the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter. No one factor is dispositive. *United States v. Abdenbi*, 361 F.3d 1282, 1291 (2004). The focus of the test is on "the coercive effect of police conduct, taken as a whole on a reasonable person." *Michigan v. Chesternut*, 486 U.S. 567, 573-74, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).

The Court has found the recent Tenth Circuit decision in *United States v. Reeves*, 524 F.3d 1161 (10th Cir. 2008) to be instructive. In *Reeves*, the Tenth Circuit overturned a district court's denial of the defendant's motion to suppress. In so doing, the Court found that the defendant was seized in his motel room during his initial encounter with the police and that absent a warrant or probable cause and exigent circumstances, as required under *Payton*, the defendant's Fourth Amendment rights were violated.

In *Reeves* the pertinent facts were as follows. At 2:43 a.m., four law enforcement officers arrived at the motel where the defendant, a "suspect" in an aggravated assault investigation, was known to be residing. He was also known to be a felon and the officers had received reports that he was in possession of a handgun. After unsuccessfully trying to reach the

defendant by having the motel manager call the defendant's room, the police officers began

knocking on the door and window of the defendant's motel room, using their police-issued metal

flashlights.  They knocked consistently for at least twenty minutes while yelling and identifying

themselves as police officers. After twenty minutes, at 3:30 a.m., the defendant came to the door.

The officers patted him down and discovered five .44 rounds in his pocket.  A protective sweep

was performed in the motel room, and a revolver and two rifles, and boxes of ammunition were

discovered in the motel room.  The defendant was subsequently arrested.

The Court found that the defendant was seized inside his motel room and that he opened

the door as a result of coercive police conduct.  It concluded that under the circumstances, a

reasonable person would not have felt free to ignore the officers.  The Court specifically noted

that although there was no evidence that the officers gave the defendant a direct order to open his

door, the officers' actions were effectively a command to open the door and it highlighted the

fact that three officers pounded on the defendant's door and window while yelling and loudly

identifying themselves as police officers for at least twenty minutes.  The Court further found it

significant that the encounter began between 2:30 a.m. and 3:00 a.m. in the morning.

The Court finds under the totality of the circumstances that Captain Medrano did not

demonstrate such a show of authority that a reasonable person would have believed that he was

not free to decline his request or otherwise terminate the encounter.  The circumstances

underlying Captain Medrano's investigation are significantly different from the circumstances of

the investigation in *Reeves*.  Captain Medrano came *alone* to Defendant's home, unaccompanied

by any other law enforcement officers.  The evidence indicated that Captain Medrano knocked

on the door, and when Defendant answered, Captain Medrano explained that he was

investigating an allegation of child abuse and had been asked to check on the welfare of the

children.  Defendant replied that if he needed to see the children, he could.  Defendant then let Captain Medrano into his home.

Defendant did not testify at the hearing.  There was no evidence presented to suggest that Captain Medrano knocked on the door for any prolonged period of time, knocked loudly, banged on any windows or otherwise conveyed to a reasonable person that his compliance was compelled.  Nor was there any evidence that prior to Defendant coming to the door, Captain Medrano announced his presence as a law enforcement officer or ordered Defendant to "open up."  This is quite different from the intrusive and coercive police conduct in *Reeves* where *three* officers knocked on the door for twenty minutes, banged on the windows and loudly identified themselves as police officers.  *See also United States v. Jerez*, 108 F.3d 684, 691-93 (7th Cir. 1997) (when officers knocked on motel room door for three minutes, identified themselves as officers, asked occupants to open door, knocked on the window for one-and a half to two minutes and shined flashlight into window, the subsequent opening of the door by defendant was submission to show of authority and seizure within the meaning of the Fourth Amendment); *United States v. Maez*, 872 F.2d 1444 (10th Cir. 1989) (suspect of bank robbery who was in his home, was seized when a SWAT team surrounded his home, with rifles pointed at the trailer, asked occupants to come out one at a time over loudspeakers and defendant complied and was taken in custody); *United States v. Conner*, 127 F.3d 663, 665-66 (8th Cir. 1997) (holding when four officers knocked on defendants' motel door three times, identified themselves as police, and demanded defendants "open up," defendants did not voluntarily consent to entry).

Furthermore, there was no evidence indicating that Captain Medrano raised his voice, brandished a weapon, physically touched or acted in any kind of a threatening or menacing manner towards the Defendant such that his behavior would convey to Defendant that his

compliance was compelled.  *See United States v. Abdenbi*, 361 F.3d 1282 (10th Cir. 2004)

(encounter at home involving three police officers beginning at 6:15 a.m. was voluntary where

there was no evidence that un-uniformed law enforcement officers physically touched, drew

weapons, raised voices or made threats or employed any force against the defendant).  To the

contrary, at the time of the entry and indeed throughout the entire encounter up until Defendant's

arrest, Captain Medrano was respectful of Defendant and courteous.  The atmosphere was calm

and orderly, devoid of any overt coercion and Captain Medrano did not indulge in any deceitful

or underhand practices to gain Defendant's cooperation.

In weighing all of the relevant factors, the Court has considered the fact that Captain

Medrano did not advise Defendant that he was free to ignore his requests or otherwise terminate

the encounter.  The Court has also considered the early morning hour at which the encounter

took place at Defendant's home.  Our law and legal traditions have long recognized the special

vulnerability of those awakened in the night by a police intrusion at their dwelling place and our

Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the "dead of

night," the nature and effect of the intrusion into the privacy of the dwelling place must be

examined with the greatest of caution. *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997); *see*

*Harless v. Turner*, 456 F.2d 1338-39 (10th Cir. 1972) (invalidating individual's consent to

search because it was obtained after individual was "routed" out of bed at 1:45 a.m.); *see also*

*United States v. Young,* 877 F.2d 1099, 114 (1st Cir. 1989) (the reason for limiting nocturnal

searches is to prevent "abrupt intrusions on sleeping residents in the dark").

Although it is certainly true that the encounter took place at a time when Defendant was

more vulnerable to coercion than during the daylight hours and Captain Medrano believes that

Defendant was in fact awakened from his sleep, it did not take place in "the dead of night" which

24

would have been an especially intrusive and vulnerable hour.  *Jerez,* 108 F.3d at 690.  The encounter began between approximately 5:45 and 6:00 a.m.  Captain Medrano testified that one of the children he saw was up and about, beginning to get ready to go to school.  There was no indication that Captain Medrano had to wait for any extended period of time before Defendant opened the door, suggesting that Defendant may not have actually been asleep or that he was not in a deep sleep at the time he responded to Captain Medrano.  Given the totality of the circumstances of the encounter and the overall relaxed and non-coercive nature of the encounter, the fact that the intrusion into Defendant's home took place in the early morning is not sufficient to change the consensual nature of the encounter into a seizure.

The procedure that Captain Medrano employed in this case can be fairly characterized as a run-of-the-mill "knock and talk" procedure.  A "knock and talk" is commonly understood as an investigative technique whereby an officer approaches and knocks on a private residence door, seeking information from the occupant who may be a possible suspect or a possible witness.  *See United States v. Walters*, 529 F. Supp.2d 628 (E.D. Tex. 2007).  Quite often, but not necessarily as in the instant case, the officer is "hoping to eventually secure [the occupant's] voluntary consent to search the premises."  *Id.* at 636.

Courts have widely acknowledged that unless a "knock and talk" is conducted in a coercive manner, it does not implicate the Fourth Amendment because no search or seizure occurs.  *See United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006) (citing *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) ("A number of courts . . .have recognized "knock and talk" consensual encounters as a legitimate investigative technique at the home of a suspect or individual with information about an investigation.")); *United States v. Jones*, 239 F.3d 716, 720-21 (5th Cir. 2001) (recognizing "knock and talk" as reasonable investigative tool).

25

*United States v. Jerez*, 108 F.3d 684, 691-92 (7th Cir. 1997) (acknowledging that a "knock and talk" is ordinarily consensual unless coercive circumstances such as unreasonable persistence by the officers turn it into an investigatory stop).

Once Defendant invited Captain Medrano into his home, Captain Medrano was able to see the children, speak with them and verify that they were alright.  Captain Medrano then asked Defendant if he had some form of identification.  Defendant told him, as he had done so earlier, that his name was Joshua Lopez and he gave Captain Medrano his date of birth and his social security number but he could not provide an identification card. At this point, approximately 15-20 minutes after Captain Medrano had arrived at Defendant's home, Captain Medrano contacted Deputy Figueroa to let him know what he had found out and to see what else needed to be done. During the course of the conversation, Captain Medrano informed Deputy Figueroa that Defendant had identified himself as Josh Lopez to which Deputy Figueroa responded "something's not right." Deputy Figueroa told Captain Medrano that Defendant's girlfriend had stated that her boyfriend's name was Josh Hernandez and that he was a deported felon.  Captain Medrano again asked Defendant his name and he stated that it was Joshua Lopez.  Captain Medrano responded that he had "conflicting information"and that he had been told his name was Joshua Hernandez.  Defendant admitted that his name was Joshua Hernandez.  Captain Medrano then asked Defendant why he had given him a false name and Defendant stated that he had recently got out of prison and that he was a deported felon.  Defendant then provided Captain Medrano with his correct social security number, which was different, by one digit, from the social security number he had originally given Captain Medrano.  At that point, Captain Medrano issued Defendant a citation for the petty misdemeanor offense of "concealing his identity" and arrested him, something that was squarely within his discretion to do.

26

B.      Defendant's Arrest for Concealing his Identity

Pursuant to the New Mexico misdemeanor-arrest rule, and consistent with the Fourth

Amendment, a law enforcement officer may arrest an individual if he has probable cause to

believe that the individual has committed a misdemeanor in his presence.  See *Cave v. Cooley*,

48 NM 478, 152 P.2d 886 (1944).  Here, the evidence clearly establishes that Captain Medrano

had probable cause to arrest Defendant for the misdemeanor offense of concealing his identity.

Probable cause to arrest exists when an officer has learned of facts and circumstances

through reasonably trustworthy information that would lead a reasonable person to believe that

an offense has been or is being committed by the person arrested.  *United States v. Guerrero-*

*Hernandez*, 95 F.3d 983, 986 (10th Cir. 1996).  In the probable cause determination, [courts]

look[ ] at the totality of the circumstances of each particular case.  *Illinois v. Gates*, 462 U.S.

213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  N.M.S.A. § 30-22-3 provides in pertinent part

that:

> concealing identity consists of concealing one's true name or identity . . .
> with intent to . . . intimidate, hinder or interrupt any public officer . . .
> in a legal performance of his duty or the exercise of his rights under
> the laws of the United States or of this state.

Here, there was an abundance of reasonably trustworthy information available to Captain

Medrano that would lead a reasonable person to believe that Defendant was committing the

offense of concealing his identity, namely that he concealed his true name or identity with the

intent of hindering Captain Medrano's performance of his duties.  Defendant had misidentified

himself as Joshua Lopez at least three times before he finally admitted to Captain Medrano that

his actual name was Joshua Hernandez.  Defendant also provided Captain Medrano with an

incorrect social security number which differed from his actual social security number by one

27

digit.  Finally, Defendant admitted that he had just got out of prison and that he was a deported

felon.  At the time Defendant admitted his true identity, Captain Medrano was already aware that

Defendant's girlfriend had told Deputy Figueroa that her boyfriend's name was Joshua

*Hernandez* and that he was a deported felon.

The Court notes that pursuant to the recent Tenth Circuit decision in *Reeves,* if Captain

Medrano's entry into Defendant's home was *not* consensual, *Payton*'s protections apply.  *Reeves*

held that *Payton*'s protections apply to all Fourth Amendment seizures of persons inside their

homes, *irrespective of whether the seizure is characterized as an investigatory stop or an arrest*

(emphasis added).  The Court stated that "labeling an encounter in the home as either an

investigatory stop or an arrest is meaningless because *Payton*'s requirements apply to all

seizures."  *Reeves* 524 F.3d at 1166 (quoting *United States v. Safari*, 272 F.3d 804, 809 (10th

Cir. 2001)).  The Court reasoned that if it were to hold otherwise, it would allow a seizure in the

home when only reasonable suspicion exists, yet prohibit a seizure in the home when an officer

has probable cause to arrest, but no exigent circumstances.  *Id.*  It explained that "[i]t cannot be

the case that *Payton*'s firm line at the entrance to the house offers less protection to individuals

for whom probable cause to arrest does not exist." *Id.*  Thus, under *Reeves*, in order to comply

with the Fourth Amendment, if entry into the home is nonconsensual, it must be supported by a

warrant or probable cause *and* exigent circumstances.  Reasonable suspicion is not enough.

In *Reeves*, the Tenth Circuit noted in a footnote that "[t]he scenario in which an

individual voluntarily opens his door to the police and is subsequently seized while still inside

his home, is not before us and we express no opinion on this situation."  *Id.* at 1167, n.4.

Therefore, *Reeves* does not hold that *any* seizure that occurs within the home must be supported

by a warrant or probable cause plus exigent circumstances, but rather the holding is limited only

28

to situations where the *entry* is nonconsensual.  Indeed, *Payton* itself, implicitly held that warrantless arrests inside the home were permissible when police entry into the home was consensual.  *See Payton*, 445 U.S. at 583; *Welsh*, 466 U.S. at 743 (inferring that if valid consent to enter the petitioner's home was given, *Payton* is not implicated); *see also Cruz-Mendez*, 467 F.3d at 1269 (because officers' entry into bedroom was consensual, *Payton* does not apply).

The chief evil against which the Fourth Amendment is designed to protect, is the non-consensual intrusion without a warrant into the dwelling place of an individual.  Here, where the entry is consensual, as indeed was the entire pre-arrest encounter between Captain Medrano and Defendant in his home, his arrest for the misdemeanor offense of concealing his identity does not implicate *Payton*, and it does not therefore need to be supported by either a warrant or probable cause and exigent circumstances.

## **CONCLUSION**

For the aforementioned reasons, the Court finds that Defendant's Equal Protection and Fourth Amendment rights were not violated by Captain Medrano of the Sheriff's Department.

**IT IS THEREFORE ORDERED** that Defendant Joshua Hernandez-Chaparro's Motion to Suppress [Doc. No. 18] is **DENIED.**

Dated this 18th day of July, 2008.

_____
MARTHA VÁZQUEZ
CHIEF DISTRICT JUDGE

Attorney for Plaintiff:
Norman Cairns

Attorney for Defendant:
Brian Pori